X FILED    RECEIVED

ENTERED    SERVED ON

1/9/2026

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY: _____ MAM DEPUTY

1   Shane Sipe, Pro Se
    3925 Six Gun Road
2   North Las Vegas, NV 89032
    702-372-4022
3   Shane_sipe@outlook.com

4                 **UNITED STATES DISTRICT COURT**
5                    **DISTRICT OF NEVADA**
                      SOUTHERN DIVISION
6

7   **SHANE EDWARD SIPE**,              Case No.:

              Plaintiff,
8
    vs.                                 **COMPLAINT FOR VIOLATION OF
9                                        CIVIL RIGHTS**

10  **LAS VEGAS METROPOLITAN POLICE
    DEPARTMENT; CLARK COUNTY, NEVADA;
    SCOTT CIECKO; JEFFREY RIVERA; RAYMOND
11  HALL; AMMON PEACOCK; TY KEKOA
    VESPERAS; FERNANDO PEREZ; KEVIN MOSS;
12  DONALD SUTTON; MATTHEW CAMPBELL;
    JASON HANSON; CHRISTOPHER BARBA;
13  [FIRST NAME UNKNOWN] CAMP; [FIRST NAME
    UNKNOWN] MORRIS; [FIRST NAME UNKNOWN]
14  TONGE; JUNIOR LOPEZ; DOES 1-20;**,

15                Defendant

16
                   **INTRODUCTION**
17

18  1.  This is a civil rights action seeking monetary damages and declaratory relief for
19      violations of Plaintiff's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments
20      to the United States Constitution, brought pursuant to 42 U.S.C. § 1983, and state law
21      claims for malicious prosecution, abuse of process, intentional infliction of emotional
        distress, negligence, and conspiracy.
22
23  2.  On April 12, 2021, Plaintiff Shane Sipe called 911 to report an active home invasion at
24      his residence. Three known violent criminals were forcing entry into his home. Plaintiff
        fired two warning shots into his ceiling to stop the intrusion. No one was injured.
25
26  3.  When police arrived, they arrested Plaintiff—the homeowner and victim who had called
        for help—and gave his house keys to one of the home invaders, Rebecca Pittman.
27
28  4.  Over the next four months, while Plaintiff was wrongfully incarcerated and fighting
        fabricated criminal charges, Defendants enabled and facilitated the complete destruction

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 1

of Plaintiff's life: his home was occupied and vandalized by criminals, all his possessions were stolen, his identity was stolen, his credit destroyed, and his vehicle taken and sabotaged.

5.  Defendants knew or should have known that Plaintiff was the victim, not the perpetrator. Video evidence, 911 recordings, and physical evidence all supported Plaintiff's account. Defendants ignored, concealed, and misrepresented this evidence.

6.  The criminal prosecution was based on lies told by the home invaders and repeated by Defendants without investigation. Prosecutors repeatedly told courts that Plaintiff was a felon with an extensive violent criminal history—all false. Plaintiff only had one 20-year-old non-violent misdemeanor.

7.  On January 10, 2024, after Plaintiff successfully moved to withdraw his coerced guilty plea, prosecutors acknowledged the injustice and dismissed all charges.

8.  This lawsuit seeks a measure of redress for the wrongs done to Plaintiff and deter such future misconduct.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

10. Venue is proper because the events giving rise to this action occurred in this district.

## PARTIES

### Plaintiff

12. Plaintiff Shane Edward Sipe is a natural person and resident of Nevada. At all relevant times, Plaintiff was a law-abiding homeowner with no violent criminal history.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 2

**Defendants**

13. Defendant **Las Vegas Metropolitan Police Department (LVMPD)** is a political subdivision of the State of Nevada and employed Defendant Officers. The LVMPD is liable for all state law torts committed by the Defendant Officers while they were employed by the LVMPD pursuant to the doctrine of *respondeat superior*. The LVMPD is responsible for its own policies, practices, and customs.

14. Defendant **Clark County, Nevada** is a political subdivision of the State of Nevada. Clark County employs LVMPD officers and is responsible for their training, supervision, policies, and customs.

15. Defendant **Scott Ciecko** (Badge #17043) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

16. Defendant **Jeffrey Rivera** (Badge #16794) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

17. Defendant **Raymond Hall** (Badge #10070) was at all relevant times a detective employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

18. Defendant **Ammon Peacock** (Badge #14309) was at all relevant times a supervising police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

19. Defendant **Ty Kekoa Vesperas** (Badge #15240) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

20. Defendant **Fernando Perez** (Badge #15496) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

21. Defendant **Kevin Moss** (Badge #16816) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

22. Defendant **Donald Sutton** (Badge #15153) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

23. Defendant **Matthew Campbell** (Badge #6959) was at all relevant times a detective employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

24. Defendant **Jason Hanson** (Badge #8380) was at all relevant times a detective employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

25. Defendant **Christopher Barba** (Badge #9629) was at all relevant times a probation officer employed by LVMPD or Clark County, acting under color of state law. He is sued in his individual and official capacities.

26. Defendant **Camp** (first name unknown, badge unknown) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

27. Defendant **Morris** (first name unknown, badge unknown) was at all relevant times a police officer employed by LVMPD, acting under color of state law. She is sued in her individual and official capacities.

28. Defendant **Tonge** (first name unknown, badge unknown) was at all relevant times a police officer employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

29. Defendant **Junior Lopez** (Badge #15051) was at all relevant times a detective in the Financial Crimes Section employed by LVMPD, acting under color of state law. He is sued in his individual and official capacities.

30. Defendants **Does 1-20** are additional LVMPD officers, detectives, supervisors, and employees whose identities are currently unknown to Plaintiff but who participated in the constitutional violations alleged herein. They are sued in their individual and official capacities.

31. At all relevant times, all individual Defendants were acting under color of state law, within the scope of their employment, and in furtherance of their duties as law enforcement officers.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 4

**FACTUAL ALLEGATIONS**

**I. BACKGROUND: THE UNWANTED GUEST (2019-2021)**

32. In February 2019, Plaintiff purchased and moved into a single-family home at 7240 Dingo Court, Las Vegas, Nevada.

33. In 2019, Rebecca Pittman was homeless and needed an address to receive a replacement driver's license from Washington State. Plaintiff allowed her to temporarily use his address as a humanitarian gesture.

34. Pittman's replacement license had no photo and stated "NOT FOR IDENTIFICATION PURPOSES."

35. When Plaintiff asked Pittman to leave, she refused, claiming that because she had received mail at the address, she was a "resident" and Plaintiff would have to evict her.

36. Plaintiff called LVMPD and reported that someone was in his home refusing to leave. Officers told Plaintiff he needed to evict Pittman through the courts.

37. Plaintiff contacted Las Vegas Justice Court and inquired about eviction. Court staff advised that if Pittman had no lease agreement, she was not a tenant, no eviction was needed, and Plaintiff should call police to have her trespassed.

38. Police continued to refuse, insisting Plaintiff needed to evict her.

39. Pursuant to Nevada law, Pittman was not a tenant under NRS 118A.170 but rather an unwelcome guest committing criminal trespass under NRS 207.200.

40. Plaintiff and Pittman never had a domestic relationship. They were not spouses, not related by blood or marriage, did not have a child in common, and never had a dating relationship. The qualifier "a person with whom he or she is or was actually residing" was removed from Nevada's domestic violence statute in 2019 to prevent this exact abuse.

41. In October 2019, Plaintiff attempted to lock Pittman out. She broke a window on Plaintiff's car and attacked his front door with a rock. Police refused to remove her, again stating "that's a civil matter."

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 5

42. This pattern continued for over a year. Plaintiff called police numerous times. LVMPD consistently refused to assist, telling Plaintiff to "evict her," while simultaneously advising that no evictions were allowed due to the COVID-19 moratorium.

43. Fearing Pittman would make false allegations to police—as she repeatedly threatened—Plaintiff installed security cameras throughout his home to record everything.

44. Plaintiff eventually moved into his garage to avoid conflict with Pittman.

## II. THE FIRST FALSE ARREST - FEBRUARY 1, 2021

45. On February 1, 2021, Pittman went to an Arco gas station at 980 E. Warm Springs Road and called LVMPD, making a false police report alleging assault, a domestic relationship, and tenancy.

46. Defendants Ciecko and Rivera responded to the gas station and accepted Pittman's fabricated claims without investigation.

47. Defendants Ciecko and Rivera had ample reason to doubt Pittman's allegations but chose not to undertake any meaningful efforts to corroborate her story or investigate readily available exculpatory evidence.

48. Defendants Ciecko and Rivera went to Plaintiff's home and, without explanation, began pounding on the front door with a flashlight.

49. Plaintiff could see the officers on his home surveillance system. Unaware of Pittman's false report, Plaintiff asked through the closed door, "What do you want?"

50. Officers Ciecko and Rivera did not respond. They continued pounding on the door with the flashlight.

51. Plaintiff asked again, "What do you want?" Still no response.

52. Plaintiff asked a third time. Officers continued pounding but did not explain their presence.

53. Finally, Plaintiff stated, "I'm calling my attorney." At that point, Officers Ciecko and Rivera stopped pounding and left.

54. The pounding left over 75 dents in Plaintiff's front door. [Exhibit 1 – photo of door dents]

55. Officers Ciecko and Rivera never informed Plaintiff why they were there, never attempted to speak with him, and never provided him notice of any allegations or legal proceedings.

56. Officer Ciecko's report included Plaintiff's correct phone number, yet neither officer attempted to call Plaintiff to establish contact.

57. Plaintiff was legally in his residence, had committed no crime, had no legal obligation to open the door, and had no obligation to respond to the aggressive and unprofessional conduct of Officers Ciecko and Rivera.

58. Plaintiff's decision not to open the door was a wise and legal choice protected by the Fourth Amendment.

59. Officer Ciecko submitted an Arrest/Detective Report using an outdated form instead of the proper MotorolaSolutions CommandCentral software suite in use since 2018. [Exhibit 2 - Officer Ciecko's Arrest/Detective Report]

60. The report strangely indicated Plaintiff had an existing SCOPE ID (5585917) despite Plaintiff having no arrests in Nevada at that time.

61. The report contained other errors including an incorrect height, an incorrect digit in Plaintiff's Social Security Number, and document footer metadata indicating the report was not generated until seven days later, on February 8, 2021 at 11:17 PM.

62. On February 8, 2021, Defendant Detective Raymond Hall, a 13-year veteran, was assigned to investigate Event #LLV210200003330.

63. Detective Hall submitted a sworn Declaration of Warrant/Summons indicating he had performed an investigation and concluded Plaintiff was the perpetrator. [Exhibit 3 - Detective Hall's sworn Declaration of Warrant/Summons]

64. Detective Hall's "investigation" consisted of merely copying and pasting the unsubstantiated narrative from Officer Ciecko's questionable report.

65. Detective Hall chose not to undertake meaningful efforts to corroborate Pittman's allegations, even though he had ample reason to doubt their reliability and even though readily available exculpatory evidence was at his disposal.

66. Detective Hall abused his authority by filing an unsubstantiated criminal complaint, an unsubstantiated domestic relation claim, and an unwarranted and egregious 5x multiplier enhancement.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 7

67. Plaintiff alleges, upon information and belief, that Defendants Hall, Ciecko, and Rivera conspired to deprive Plaintiff of his civil right to due process by filing Case No. 21-CR-011347 in an intentionally improper manner.

68. The case record incorrectly indicates Plaintiff was arrested on February 1, 2021, and prosecution commenced—all while Plaintiff was completely unaware and no required notification was attempted.

69. In early March 2021, Plaintiff applied for employment as a Lyft driver.

70. On March 15, 2021, pursuant to conditional employment, Lyft ordered a background check on Plaintiff.

71. On March 19, 2021, Plaintiff received an email from Checkr stating he had failed the background check.

72. The background report showed five counts of Domestic Violence dated February 8, 2021, under Case No. 21-CR-011347.[Exhibit 4 – failed Checkr background report]

73. Plaintiff searched all courts within Clark County, including Las Vegas Justice Court, and found no charges and no such case number.

74. Plaintiff filed a dispute with Checkr, advising them they had the wrong person.

75. On March 29, 2021, Lyft voided the employment arrangement.

76. Also on March 29, 2021—according to the case docket—Detective Hall's Declaration of Warrant/Summons was stamped by the Court Clerk as filed.

77. The docket contains no earlier entries indicating any prior filing, yet Checkr was able to ascertain the exact criminal charges and correct case number over three weeks before the docket indicates that should have been possible.

78. On April 2, 2021, Checkr advised Plaintiff their reinvestigation found the background report was accurate.

79. An internet search finally revealed Case No. 21-CR-011347 with a scheduled court date of April 14, 2021.

80. Plaintiff began calling LVMPD seeking information but, as the alleged defendant, no one would provide any information.

81. On April 9, 2021, Plaintiff finally obtained the Incident Report and discovered Pittman's false allegations. Plaintiff locked Pittman out of his home to protect himself.

82. On April 10, 2021, Plaintiff was informed of his mother's death.

83. On April 10, 2021, Plaintiff was forced to retain defensive counsel Nevada Defense Group at a cost of $2,250 for Case No. 21-CR-011347.

84. On May 4, 2021, at the bench trial for Case No. 21-CR-011347, Prosecutor Yu Meng offered to reduce the five counts to a single count if Plaintiff pled guilty.

85. Plaintiff refused the offer.

86. Prosecutor Yu Meng then dismissed all charges. The case was closed.

## III. THE HOME INVASION - APRIL 11-12, 2021

### A. Threats and Coordination

87. On April 11 and 12, 2021, Pittman and her associate Katrina Amaya Lopez sent Plaintiff numerous threatening and incriminating text messages.

88. The messages included threats of physical violence, threats to lie to police, threats to frame Plaintiff, and coordination of a plan to forcibly enter Plaintiff's home.

89. The texts show clear premeditation and coordination between Pittman, Katrina Lopez, and others to invade Plaintiff's home.

90. On April 11, 2021, at approximately 11:30 PM, Pittman made a call for police service because Plaintiff had locked her out of Plaintiffs home.

91. On April 12, 2021, at approximately 4:00 AM, Pittman made another call for police service because Plaintiff continued to refuse to allow her to enter Plaintiffs home.

92. Plaintiff alleges, upon information and belief, that responding officers conspired with Pittman and coached her to claim Plaintiff had a shotgun in the home and that if Pittman claimed she feared for her life, officers would then be able to enter the home and remove Plaintiff, allowing Pittman to unlawfully occupy Plaintiff's home. [Exhibit 5 – texts from Pittman alluding to police conspiracy]

93. At 2:00 AM on April 12, 2021, Pittman attempted to steal $800 from Plaintiff's checking account using CashApp. The withdrawal was declined by the bank as fraud. [Exhibit 6 – screenshot Attemped bank withdrawal] Plaintiff informed Pittman he would be reporting her attempted theft to police in the morning.

**B. The Home Invasion**

97. At 10:25 AM on April 12, 2021, Pittman arrived at Plaintiff's home and waited outside for Katrina Lopez and Jacob Gietler to arrive.

98. At 10:31 AM, Pittman disabled two of Plaintiff's home security cameras in an effort to prevent the planned home invasion from being captured on video.

99. At 10:32 AM, Katrina Lopez, Jacob Gietler, and two unknown individuals arrived. Together with Pittman, they attempted to enter Plaintiff's home via the locked front door.

100. **At 10:33 AM, Plaintiff called 911 requesting police and reported an active home invasion.**

101. At 10:34 AM, Pittman and Gietler, and Katrina Lopez split up to simultaneously attack the front and rear entrances.

102. Katrina Lopez (who weighs approximately 400 pounds) began trying to break open the front door.

103. Pittman and Gietler went around the house, ripped down privacy screening, forced entry into the enclosed rear patio, and entered the home through the back door.

104. Plaintiff yelled, "Get out of my home!"

105. Plaintiff fired one warning shot upward into the roof, successfully causing Pittman and Gietler to retreat.

106. Seeing the extensive damage Katrina Lopez was inflicting on the front door, and fearing she would breach it, Plaintiff fired a second warning shot through the front door, 12 inches above Katrina Lopez's head, at a 45-degree angle into the ceiling above her head.

107. The warning shot successfully stopped the assault and thwarted the attempted home invasion.

108. **No one was injured.**

109. **Plaintiff called 911 again and advised: "Shots fired, no injuries, keep the cops coming."**

110. The entire incident was captured on Plaintiff's remaining home surveillance cameras. [Exhibit 7 – Home Surveillance Video https://youtu.be/bOiwkN8IKKU?si=mAvug1dPc8wSGzEJ]

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 10

## C. False Information to Responding Officers

111.     LVMPD dispatch gave arriving officers completely false information about

Plaintiff, including:

01:14 - It's also going to be a CIT call. We were out there, we tried to go out there earlier this morning on day shift, And three other times for grieves. And the male in the house, **he's a prohibited person convicted out of Texas** and he's not supposed to have any 413s [firearms], and he supposedly **has a shotgun** inside the house

06:24 - All units on this channel that are not familiar with that address, there is a previous 417 [family disturbance] with that Male, his name is Shane Sipe. He does have a BB gun and a machete inside the residence. **He's 421A [mental health issue]. He's undiagnosed. He has severe depression.** Be advised that he would barricade himself inside the residence if officers arrived and would not answer. And that was on a previous event.

08:37 - Let's get the suspect identified, get a hold of FusionWatch, need a workup done on him.

08:44 – The suspect is going to be the Shane Edward

08:59 – It looks like the male has been identified as that Shane guy

10:49 - FushionWatch is doing a workup on him.

20:18 – It looks like '08 he had an Aggravated Assault with a Deadly Weapon conviction but for disposition it doesn't say Conviction it just says Held.

112.     **Absolutely none of that was true.**

113.     Plaintiff was not a prohibited person, had no felony convictions, was not mentally ill, had no history of barricading, and had no aggravated assault conviction.

114.     Plaintiff alleges, upon information and belief, that these false allegations were part of a conspiracy to deprive Plaintiff of his civil rights, creating a dangerous confrontation and justifying excessive force.

## D. The Arrest of the Victim

115.     It took approximately one hour before police arrived at Plaintiff's home.

116.     The responding officers were Defendants Peacock, Vesperas, Perez, and Moss.

117.     Plaintiff met the officers at his front door on his front porch.

118.    Immediately, one officer yelled, "You have to evict her!"

119.    Plaintiff responded, "No I don't, and I'll burn this house down with me in it before I let her back in here," making clear he did not want Pittman in his home.

120.    Plaintiff handed Defendant Peacock (the supervisor) a letter from the Las Vegas Police Protective Association explaining Plaintiff did not have to evict Pittman. [Exhibit 15 - letter from the Las Vegas Police Protective Association]

121.    Defendant Peacock threw his hands up, walked away as if he didn't have time to listen, and left the other officers unsupervised.

122.    Plaintiff explained to the remaining officers that he had just stopped a home invasion by firing two warning shots into his roof, that no one was injured, and that it was all captured on video, so there would be no problem prosecuting the criminals.

123.    Plaintiff expected assistance. Instead, officers repeatedly demanded to enter Plaintiff's home to "see the rifle."

124.    Plaintiff refused to allow Defendant officers to enter his home.

125.    Officers refused to discuss anything else and insisted on seeing the rifle.

126.    Finally, Plaintiff said, "If you need to see it that bad, I'll grab it and bring it out to you."

127.    Plaintiff went inside, retrieved the rifle, and brought it outside.

128.    Officers had retreated behind cover and had their guns drawn and pointed at Plaintiff.

129.    Plaintiff slowly placed the rifle on the ground and went back inside, locking the door.

130.    Plaintiff began calling attorneys and backing up video footage from his security cameras to preserve evidence of the home invasion.

131.    Officers began calling Plaintiff. Plaintiff remained polite and respectful during phone calls with Defendant Officer Sutton.

132.    Officer Sutton repeatedly stated Plaintiff needed to come outside "to discuss things" and swore officers were not going to arrest Plaintiff—they just wanted to talk.

133.    Plaintiff explained he was not going to give up his rights by coming outside without counsel present.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 12

134.     Plaintiff told Officer Sutton he was backing up video evidence and would come out when finished.

135.     Officer Sutton repeatedly agreed to give Plaintiff time but then called back much sooner than agreed: [Exhibit 8 – recorded phone calls]

| Call # | Start Time | Duration | End Time | Notes |
|---|---|---|---|---|
| 1 | 11:08 AM | 0:54 | 11:09 AM | Agreed to meet at front door |
| 2 | 12:02 PM | 2:38 | 12:05 PM | Agreed to 10 minutes to call attorney, but called back after only 6 minutes |
| 3 | 12:11 PM | 4:41 | 12:16 PM | Sutton gave his number to call after speaking with attorney, but called again in 1 minute |
| 4 | 12:17 PM | 1:25 | 12:19 PM | Requested 15 minutes to finish backing up video. Called back in 18 minutes |
| 5 | 12:37 PM | 6:02 | 12:43 PM | Agreed to 13:10 (27 minutes) but called back in 13 minutes |
| 6 | 12:56 PM | 8:55 | 13:04 PM | Again agreed to 13:10 (6 minutes) but called back in 5 minutes |
| 7 | 13:09 PM | 1:37 | 13:11 PM | Threatened to send in dogs |

136.     Officer Sutton was deliberately wasting Plaintiff's time on the phone, preventing him from completing the video backup and consulting with legal counsel.

137.     After two hours, the video backup was only 50% complete.

138.     Officer Sutton threatened to break out windows and send dogs into Plaintiff's home.

139.     Plaintiff came outside to avoid being attacked by dogs.

140.     **Officers IMMEDIATELY arrested Plaintiff without reading him his Miranda rights.**

141.     Plaintiff invoked his right to remain silent.

142.     Plaintiff had already explained his side of the story to multiple officers, but it was clear Defendants did not care about Plaintiff's account or the evidence supporting it.

**E. Fabricated Police Reports**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 13

143.    Defendant Detective Matthew Campbell conducted a taped interview with Pittman starting at 2:02 PM and ending at 2:15 PM (13 minutes).

144.    Defendant Detective Jason Hanson conducted a taped interview with Katrina Lopez starting at 2:05 PM and ending at 2:20 PM (15 minutes).

145.    Defendant Detective Campbell conducted a taped interview with Plaintiff starting at 3:03 PM and ending at 3:04 PM (**one minute**).

146.    Defendant Vesperas submitted a Domestic Violence Report stating: "Shane acknowledges that Rebecca is a resident and can enter but her two friends was not welcome. Shane then admitted that he shot two rounds from his rifle into his roof at a 45-degree angle to make them leave." [Exhibit 9 - ID---Domestic-Battery-Report---LLV210400051751----5585917---15240---SIPE---SHANE---4-12-2021.pdf]

147.    This statement is a complete fabrication. Plaintiff never acknowledged Pittman was a resident with a right to enter.

148.    **Defendant Vesperas deliberately omitted any mention of Plaintiff calling 911 first, reporting a home invasion, and defending himself.**

149.    Defendant Detective Hanson submitted an Application for Telephonic Search Warrant [Exhibit 10 - EV---Search-Warrants---LLV210400051751-------8380---GIETLER---JACOB---4-12-2021.pdf] indicating a start time of 4:05 PM and end time of 4:13 PM—an 8-minute duration.

150.    The affidavit is 1,930 words and cannot be recited in 8 minutes.

151.    **Defendant Hanson also deliberately omitted any mention of Plaintiff calling 911 first, reporting a home invasion, and defending himself.**

152.    The search warrant specifically authorized seizure of "telephonic information to include caller ID history, answering machine messages, voicemails, phone directories, contacts, call history, photographs, and audio and video recordings stored in residential or cellular phones."

153.    **Defendant Hanson did not collect ANY telephonic information**, even though text messages alone clearly showed the alleged victims were the aggressors and had coordinated the attack.

**F. Illegal Search**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 14

154.    Police photographs of Plaintiff's home begin with file 2552286-0001-JPG.jpg timestamped 4:48pm. [Exhibit 11 - 2552286-0001-JPG.jpg w/ metadata]

155.    Photo 2552286-0037-JPG.jpg is timestamped by the camera at 5:12 PM but includes a clock on the wall showing **the actual time was 4:04 PM**. [Exhibit 12 - 2552286-0037-JPG.jpg w/ metadata]

156.    Photo 2552286-0070-JPG.jpg is timestamped by the camera at 5:17 PM but includes another clock on the wall showing **the actual time was 4:08 PM**. [Exhibit 13 - 2552286-0070-JPG.jpg w/ metadata]

157.    File metadata indicates the camera was a Canon EOS 80D.

158.    The Canon EOS 80D has a manually adjustable clock.

159.    This strongly suggests the officer taking photos manually set the camera's clock ahead by 1 hour and 8 minutes to hide the fact that **officers entered, searched, and began photographing Plaintiff's home at 3:40 PM—before the search warrant was granted at 4:13 PM.**

### G. Deliberate Misidentification of Evidence

160.    Plaintiff alleges, upon information and belief, that Defendants Vesperas, Hanson, and other LVMPD officers **filed case documents under the name of Jacob Gietler**—one of the home invaders—rather than under Plaintiff's name.

161.    Documents that should have been filed under Plaintiff's name include:

EV---Additional-Crime-Info---LLV210400051751-------15240---**GIETLER---JACOB**---4-12-2021.pdf
EV---Digital-Investigations-Report---LLV210400051751-------15240---**GIETLER---JACOB**---6-9-2021.pdf
EV---Forensic-Lab-Report-Analysis---LLV210400051751---0---15240---**GIETLER---JACOB**---5-17-2021—.pdf
EV---Property-Report---LLV210400051751-------15240---**GIETLER---JACOB**---4-12-2021.pdf
EV---Property-Report---LLV210400051751-------15240---**GIETLER---JACOB**---4-12-2021_78940695.pdf
EV---Crime-Scene-Report---LLV210400051751-------15709---**GIETLER---JACOB**---4-12-2021.pdf
EV---Evidence-Impound-Property-Report-FA-Worksheet---LLV210400051751-------15709---**GIETLER---JACOB**—.pdf
EV---Search-Warrants---LLV210400051751-------8380---**GIETLER---JACOB**---4-12-2021.pdf

- Crime Scene Reports
- Property Reports from Plaintiff's own residence
- Forensic Lab Reports

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 15

- Additional Crime Information
- Digital Investigations Reports of Plaintiff's seized property
- Search Warrant for Plaintiff's home

162.     All of these documents were saved under Gietler's name in the LVMPD system.

163.     This deliberate commingling of files served multiple improper purposes:

- It allowed prosecutors to misattribute Gietler's extensive violent criminal history to Plaintiff at bail hearings
- It obscured the fact that Gietler was a home invader, not a victim
- It corrupted the chain of custody and organization of evidence
- It violated Plaintiff's due process right to a properly maintained case file

164.     There is no logical reason why any of these files should be saved under Gietler's name.

165.     This demonstrates intentional actions by LVMPD officers conspiring to deprive Plaintiff of civil rights, including due process.

## IV. MALICIOUS PROSECUTION & FALSE IMPRISONMENT

### A. The Charges

166.     On April 14, 2021—Plaintiff's 49th birthday—an officer came to the holding cell at Clark County Detention Center and gave Plaintiff his charges for Case No. 21-CR-017669:

- Three (3) counts of Attempted Murder
- Three (3) counts of Assault with a Deadly Weapon
- Three (3) counts of Discharging a Gun in a Prohibited Area
- Three (3) counts of Discharging a Gun Into an Occupied Structure

167.    **All charges stemmed from Plaintiff firing two warning shots during a home invasion.**

168.    Also on April 14, 2021, officers came to the holding cell and officially "arrested" Plaintiff on the previously filed Case No. 21-CR-011347 (the five Domestic Battery charges from February that Plaintiff had been unaware of until April 9).

### B. Denial of Bail Based on False Criminal History

169.    On April 15, 2021, Plaintiff was appointed the Public Defender for Case No. 21-CR-017669.

170.    At the bail hearing, Prosecutor Yu Meng vehemently argued that Plaintiff should not receive bail because of his **"extensive violent criminal history."**

171.    It was the middle of the COVID-19 pandemic, and courts were giving OR releases to almost everyone except the "worst of the worst."

172.    **Plaintiff did not receive an OR release.** Bail was set at $10,000 with high-level electronic monitoring.

173.    **Prosecutor Yu Meng's statements about Plaintiff's criminal history were false.**

174.    Plaintiff had **one 20-year-old non-violent misdemeanor** for Interfering with Public Duty.

175.    Plaintiff had **no felonies, no violent convictions, and no prohibitions on firearm possession.**

176.    The preliminary hearing for Case No. 21-CR-017669 was set for April 29, 2021.

### C. Media Coverage Based on False Narrative

177.    On April 16, 2021, Las Vegas Review-Journal reporter Glenn Puit wrote an article relaying the completely false narrative of events reported by LVMPD. [Exhibit 14 – RJ article]

178.    The article completely omitted Plaintiff's 911 call and made no mention of the home invasion or Plaintiff's claim of self-defense.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 17

179.     The article also reported: "Las Vegas Justice Court records indicate Sipe was arrested two weeks prior (March 29, 2021) and charged with domestic violence."

180.     This suggests court records had been manipulated, as the Disposition Notice for Case No. 21-CR-011347 currently indicates an arrest date of February 1, 2021.

181.     Someone continued to manipulate the record to cover up irregularities in the case.

## V. INCARCERATION & DEPRIVATION OF PROPERTY

### A. Conditions of Confinement

182.     Plaintiff was booked into Clark County Detention Center (CCDC).

183.     Plaintiff was provided no means to remove his single-use daily wear contact lenses and was forced to remove them without saline solution, rendering his 20/200+ vision uncorrected (legally blind) for the duration of his incarceration.

184.     Plaintiff was not provided with the prescription drug Wellbutrin, which he had been taking daily for several years. The manufacturer warns against suddenly stopping this medication.

185.     Plaintiff's phone was placed in property (not evidence), and Plaintiff could not remember anyone's actual phone numbers, preventing him from calling anyone for help.

186.     Plaintiff was thrown into an overcrowded holding cell during the COVID-19 Pandemic.

### B. Theft and Destruction Enabled by Police

187.     Following Plaintiff's arrest, Pittman was allowed to occupy Plaintiff's home and was showered with support from the Victim Services Unit.

188.     Pittman was assigned a Victim Advocate who assisted her in obtaining a Temporary Protective Order (TPO) from Family Court **prohibiting Plaintiff from his own home.**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 18

189.     Two witnesses were present when Defendant Detective Campbell told Pittman **she could sell everything in the house if she wanted to**—which she did.

190.     While Plaintiff was incarcerated fighting false charges, Pittman and her associates:

- Drained Plaintiff's checking and savings accounts
- Opened new credit cards in Plaintiff's name
- Maxed out all existing credit cards
- Stole and sold all of Plaintiff's tools, computers, electronics, appliances, furniture, and personal belongings
- Sold Plaintiff's 2002 Acura vehicle
- Vandalized the home with holes in walls, spray paint, and broke the water main

191.     The total value of stolen property exceeds $100,000.

192.     Pittman had 5-6 Amazon orders delivered to Plaintiff's home every day, charging over $6,000 to Plaintiff's Discover card in one month alone.

193.     Pittman ran up over $16,000 in fraudulent charges on new credit cards opened in Plaintiff's name.

194.     Plaintiff's lawful tenant, Colleen Keating, and her son Jonathan Frizzell were forcibly trespassed from the home by unknown LVMPD officers at Pittman's unauthorized request, forcing them to leave their personal property behind to also be stolen by Pittman.

## VI. INEFFECTIVE ASSISTANCE & COERCED PLEA

### A. Public Defender Kristal Bradford

195.     On April 22, 2021, before ever meeting with Plaintiff, Public Defender Kristal Bradford moved to withdraw due to a conflict from having previously defended alleged victim Jacob Gietler.

196.    The criminal history disclosed in the motion to withdraw sounded very much like what Prosecutor Yu Meng kept claiming was **Plaintiff's** record whenever arguing against bail.

197.    Conflict counsel Caesar Almase was appointed in absentia.

198.    This appointment caused the Court to reset the preliminary hearing from April 29 to May 6, 2021—another two-week delay.

### B. Damien Sheets - The "Private Attorney" Hired by Pittman

199.    On April 23, 2021, in an effort to prolong Plaintiff's incarceration and give Pittman more time to sell Plaintiff's belongings, **Pittman retained attorney Damien Sheets "on behalf of" Plaintiff** for Case No. 21-CR-017669.

200.    Pittman fed Sheets her convoluted and false version of events.

201.    Caesar Almase filed a Substitution of Attorney appointing Damien Sheets as Plaintiff's attorney **without getting Plaintiff's consent or even informing Plaintiff.**

202.    Sheets never met with Plaintiff to hear his side of the story or inform him of the substitution.

### C. The Recorded Phone Call

203.    After being in CCDC for three weeks without anyone contacting him, Plaintiff received a letter from someone named "Sara" with a phone number.

204.    Desperate for information, Plaintiff called the number on May 1, 2021, and discovered it was actually Pittman using a fake name.

205.    Pittman blamed everything on Katrina Lopez, claiming Katrina had filed the criminal complaint because she was angry Plaintiff had fired a gun at her.

206.    Plaintiff stated: "Kat needs to realize I could have leveled that rifle and put that bullet in her face. I swear to God if she'd have hit that door one more time it would have come down and then I'd have had to shoot her."

207.    This statement was later taken out of context by Prosecutor Yu Meng.

### D. Forfeiture by Wrongdoing

208.     Later on May 4, 2021, seemingly in retaliation for having to dismiss Case No. 21-CR-011347, Prosecutor Yu Meng filed a Motion for Forfeiture by Wrongdoing in Case No. 21-CR-017669.

209.     Prosecutor Yu Meng submitted two recorded phone calls to Judge Joseph S. Sciscento.

210.     The first call was not even Plaintiff—it was another inmate having a happy, loving conversation with his wife or girlfriend about their recently born child.

211.     The second call was Plaintiff's call to Pittman in which Plaintiff's comment about "leveling the rifle" was taken out of context and claimed to be a threat to keep Katrina Lopez from testifying.

212.     This gave Judge Sciscento the false belief that Pittman and Plaintiff were a couple colluding to undermine the prosecution's case.

### E. Caesar Almase's Ineffective Assistance

213.     On May 5, 2021, Damien Sheets filed an Opposition to the Motion for Forfeiture by Wrongdoing.

214.     However, since Sheets had still not met with Plaintiff or obtained Plaintiff's version of events, he only had Pittman's completely false account.

215.     Sheets was not even aware of the home invasion.

216.     The Opposition failed miserably and squandered an opportunity to present the correct facts and Plaintiff's self-defense claim.

217.     On May 6, 2021, at the preliminary hearing for Case No. 21-CR-017669, Judge Sciscento decided to bifurcate the hearing in order to review the recorded calls before ruling on Prosecutor Yu Meng's Motion for Forfeiture by Wrongdoing.

218.     Officer Vesperas testified, repeating the fabricated claim that Plaintiff "admitted" to shooting his roof twice, with no mention of Plaintiff's 911 call or the home invasion.

219.     On May 10, 2021, Judge Sciscento granted the Motion for Forfeiture by Wrongdoing based on false information.

220.     Defense moved to release Plaintiff on bail with Intensive Supervision instead of High Level Electronic Monitoring.

221.    Prosecutor Yu Meng again falsely claimed Plaintiff had an extensive violent criminal history and vehemently argued Plaintiff be held without bond.

222.    Motion denied.

223.    The preliminary hearing was reset to May 20, 2021.

### F. Release on Bail and Continued Harassment

224.    On May 17, 2021, Plaintiff was finally released on bail with house arrest and ankle monitoring at his home address: 7240 Dingo Court.

225.    Plaintiff arrived home to changed locks and had to break into his own home.

226.    Plaintiff discovered all his tools, computers, and electronics were gone.

227.    On May 18, 2021, Pittman kept calling and texting Plaintiff using different numbers and names, trying to trick him into violating the no-contact order.

228.    Pittman also repeatedly called Plaintiff's Probation Officer Barba, falsely claiming Plaintiff was calling and harassing her.

229.    Officer Barba called Plaintiff, angry and yelling that if Plaintiff didn't leave Pittman alone, he would remand Plaintiff to custody.

230.    That evening, Pittman unlocked Plaintiff's front door, entered the living room, grabbed Plaintiff's dog, ran to a car, and drove away.

231.    Plaintiff called Officer Barba, who told Plaintiff to file a police report.

232.    Plaintiff called LVMPD, and two officers actually came to Plaintiff's home.

233.    Plaintiff explained and showed officers surveillance video of Pittman stealing the dog.

234.    **Officers refused to even take a report.**

235.    On May 19, 2021, Officer Barba called Plaintiff again, angry and yelling that Pittman had called his supervisor claiming Plaintiff had been harassing her at her storage unit.

236.    Officer Barba threatened that if he had to come check on Plaintiff, he would remand Plaintiff.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 22

237.    On May 20, 2021, at the second half of the bifurcated preliminary hearing, Prosecutor Yu Meng had already prevailed on Forfeiture by Wrongdoing, and Pittman had threatened to commit perjury on the stand.

238.    To limit further damage, Plaintiff waived his right to the preliminary hearing.

239.    Prosecutor Yu Meng attempted to have Plaintiff remanded back into custody based on Pittman's false accusations.

240.    When shown the actual text messages proving Pittman was lying, Yu Meng withdrew the motion to remand.

241.    Judge Sciscento had a witness warrant and subpoena on Pittman, granting him legal authority to make the no-contact order mutual.

242.    Judge Sciscento instructed Pittman directly that she was to stop all contact or be arrested and held until trial.

243.    Case No. 21-CR-017669 was bound over to District Court as Case No. C-21-356187-1, with arraignment scheduled for June 2, 2021.

## VII. THE MAY 24, 2021 CONSPIRACY - FALSE ARREST BASED ON MISREPRESENTED TPO

### A. Family Court Issues Improper TPO

244.    On May 24, 2021, at 2:15 PM, a hearing was held in Family Court Case No. T21214200t before Hearing Master Holly Roys. [Exhibit 16 – Video of Family Court 5/24/21]

245.    Hearing Master Roys stated on the record: "Any new application for a protective order has to be supported by new allegations of domestic violence."

246.    **Pittman presented no new allegations of domestic violence.**

247.    Despite this, **Hearing Master Roys granted a new TPO.**

248.    Hearing Master Roys confirmed on the record that:

• The house belonged to Plaintiff (not Pittman)

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 23

- Plaintiff and Pittman were not married
- The Court had no legal authority to prohibit Plaintiff from his own home and allow Pittman to occupy it.

249.    The TPO only authorized a civil standby for Pittman to retrieve **"the dog ONLY"** and listed Pittman's address as "Confidential."

250.    **Critically, the TPO did NOT list Plaintiff's home address (7240 Dingo Court) as a restricted or prohibited location.**

251.    Hearing Master Roys **deliberately undermined Judge Sciscento's mutual no-contact order** by telling Pittman, "A judge in Sipe's case has no authority over you" and that Plaintiff was "manipulating" her.

252.    **The hearing ended at 2:28 PM.**

### B. The Police Conspiracy - 32 Minutes Later

253.    **At 3:00 PM—only 32 minutes after the Family Court hearing ended—Defendants Barba, Camp, Morris, and Tonge arrived at Plaintiff's home together.**

254.    All four officers had access to and reviewed the TPO before arriving.

255.    **All four officers knew exactly what the TPO said and what it did not say.**

256.    The coordinated arrival 32 minutes after the Family Court hearing proves premeditation and coordination.

257.    When Plaintiff opened the door, Defendant Barba immediately grabbed Plaintiff and physically yanked him out the front door.

### C. The Deliberate Lies About the TPO

258.    Defendant Barba told Plaintiff:

- Pittman had a TPO
- Pittman was "taking the house for a month"
- **Plaintiff's home address was now a prohibited location**
- Plaintiff could no longer be on house arrest there
- Plaintiff was going back to CCDC

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 24

259. **Every single statement was false, and Barba knew it was false because he had just read the TPO.**

260. Defendants Camp, Morris, and Tonge stood by, heard Barba's false statements, knew they were false from reading the same TPO, and said nothing to correct them.

261. **This was not a mistake or misunderstanding. All four officers conspired to misrepresent the TPO's contents to manufacture grounds for arrest.**

262. The conspiracy is proven by: [Exhibit 19 – Recorded phone calls to Colleen Keating during Defendant Barba's rearrest of Plaintiff]

- Barba's specific, detailed false statements about TPO contents
- Camp, Morris, and Tonge's knowing silence despite having read the same TPO
- Their coordinated actions: Barba arrests, Tonge searches for "weapons," Camp and Morris stay to install Pittman
- **None of them showed Plaintiff the TPO** (to prevent him from seeing the truth)
- **None of them gave Plaintiff a copy** (to prevent future proof of their lies)
- **Barba did not leave a copy at CCDC** (to prevent jail staff from seeing the lies)

### D. The Manufactured "Prohibited Weapon" Charge

263. After Barba forcibly removed Plaintiff from Plaintiff's home, Defendant Tonge searched the house.

264. Tonge emerged with a machete—a common household/yard tool that Plaintiff was legally entitled to possess.

265. Officers claimed this made Plaintiff in possession of a "prohibited weapon" to justify the arrest after the fact.

266. **This was a pretext.** The machete was not illegal, and officers had no probable cause to search for it.

267. The search and seizure of the machete was part of the conspiracy to manufacture justification for the unlawful arrest.

### E. Refusal to Show the Evidence of Their Lies

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 25

268.    **Defendant Barba never let Plaintiff read the TPO**—because doing so would immediately expose the lies.

269.    **Defendant Barba never gave Plaintiff a copy of the TPO**—to prevent Plaintiff from proving the false arrest.

270.    **Defendant Barba never left a copy of the TPO at CCDC when booking Plaintiff**—to prevent jail officials from questioning the legality of the arrest.

271.    Defendants Camp and Morris witnessed all of this and participated in the cover-up by remaining silent.

272.    Defendant Barba **refused to let Plaintiff retrieve his prescription eyeglasses or wallet**, demonstrating malice and intent to cause additional harm.

### F. Installation of Pittman and Removal of Lawful Tenants

273.    After arresting Plaintiff based on lies, Defendants Camp and Morris **remained at Plaintiff's home and allowed Pittman to reoccupy it.**

274.    This was the conspiracy's goal: remove Plaintiff, reinstall Pittman.

275.    Unknown Defendant Officers (Does 1-10) then **forcibly trespassed Plaintiff's lawful tenant Colleen Keating-Frizzell and her son Johnathan Keating-Frizzell** from the home at Pittman's request. [Exhibit 20 – Colleen Keating trespass card]

276.    The trespass was unlawful—Keating was a lawful tenant with more right to be there than Pittman.

277.    This was done to give Pittman unfettered access to complete the theft and vandalism of Plaintiff's home.

### G. Subsequent Admissions Prove the Conspiracy

278.    On June 22, 2021, at a Family Court hearing, Hearing Master Roys stated on the record that **Plaintiff was never properly served the TPO.** [Exhibit 16 – Video of Family Court 5/24/21]

279.    This proves Defendant Barba's arrest was unlawful—Plaintiff could not violate an order he had never been served with.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 26

280.      On June 30, 2021, at another Family Court hearing, Hearing Master Roys confirmed **Plaintiff's home address was NOT a prohibited location on the TPO.**

281.      Pittman's Motion to Modify the TPO to add Plaintiff's home as a restricted location was **expressly DENIED.**

282.      **This proves Defendant Barba lied on May 24, 2021 when he said the home was a prohibited location.**

283.      On August 5, 2021, when Plaintiff called LVMPD for assistance removing Pittman from his home after his release, responding officers reviewed the TPO and **confirmed it had not been properly served and did not restrict Plaintiff from his home.**

284.      Rather than apologize or assist Plaintiff, those officers served Plaintiff with the TPO on the spot—demonstrating LVMPD's institutional commitment to the conspiracy against Plaintiff.

### H. The Agreement and Its Purpose

285.      Defendants Barba, Camp, Morris, and Tonge reached an agreement and understanding to:

- Misrepresent the TPO's contents to Plaintiff
- Falsely claim Plaintiff's home was a prohibited location
- Arrest Plaintiff without probable cause
- Manufacture a "weapons violation" as pretext
- Remove Plaintiff from his home
- Install Pittman in Plaintiff's home
- Remove lawful tenants
- Conceal their lies by refusing to show or provide the TPO

286.      The conspiracy's purposes were to:

- Keep Plaintiff incarcerated longer
- Give Pittman more time to steal and vandalize

- Protect Pittman (the actual criminal) from Judge Sciscento's order
- Cover up LVMPD's ongoing protection of Pittman
- Retaliate against Plaintiff for the May 4 dismissal of Case No. 21-CR-011347
- Enable complete destruction of Plaintiff's property

287.    **This was not negligence or mistake. Four trained officers do not simultaneously "misread" a simple court order in the exact same false way.**

288.    This was deliberate, coordinated deprivation of liberty and property accomplished through fabrication and conspiracy.

## VIII. CONTINUED INCARCERATION AND ATTORNEY FAILURES

289.    Plaintiff was re-incarcerated at CCDC without his prescription eyeglasses, rendering his 20/200+ vision uncorrected.

290.    On June 2, 2021, at the Initial Arraignment for Case No. C-21-356187, Pittman had reversed payment to Attorney Damien Sheets.

291.    Defensive counsel Baylie Hellman requested a continuance to meet with Plaintiff to discuss payment arrangements.

292.    On June 7, 2021, Baylie Hellman petitioned to withdraw as counsel. Motion granted. Arraignment continued to June 9, 2021.

293.    On June 9, 2021, Plaintiff told the court he could not afford a private attorney. The court reappointed Caesar Almase. Arraignment continued to June 16, 2021.

294.    On June 16, 2021, Caesar Almase confirmed as counsel but had not met with Plaintiff. Almase requested another week. Arraignment continued again.

295.    On June 18, 2021, Caesar Almase finally met with Plaintiff.

296.    Plaintiff explained the home invasion and Prosecution's repeated false claims about Plaintiff's criminal history.

297.    On June 19, 2021, Plaintiff had his personal cell phone released from property at CCDC to Colleen Keating, who gave it to Caesar Almase.

298.    On June 23, 2021, Plaintiff was finally arraigned, pled NOT GUILTY, and invoked the 60-DAY RULE.

299.    The Preliminary Hearing transcript was not yet filed, tolling the 21-day limit for filing Writs.

300.    Calendar call was scheduled for August 2, 2021. Jury trial scheduled for August 9, 2021.

301.    On June 28, 2021, Colleen Keating emailed a witness statement from Donnie Lewis to Caesar Almase about Pittman admitting to orchestrating the home invasion and selling all Plaintiff's possessions.

302.    On July 7, 2021, Caesar Almase emailed Colleen Keating admitting he had not spoken with Plaintiff in weeks, acknowledging he still had not viewed Plaintiff's home surveillance videos, and noting he would be on vacation from July 11-27.

303.    On July 10, 2021, the Preliminary Hearing transcript was finally filed, starting the 21-day deadline for filing Writs. **Deadline: July 30, 2021.**

304.    **July 11-27, 2021: Caesar Almase went on a three-week vacation during the critical window.**

305.    On July 30, 2021—**the deadline for filing Writs**—Prosecutor Yu Meng filed a State's Notice of Witnesses, going from 16 witnesses to 53.

306.    **Caesar Almase filed NOTHING on behalf of Plaintiff.**

307.    That same day, Almase emailed Colleen Keating stating he had viewed the home surveillance videos and they were "very damaging to our case."

308.    Almase stated: **"It's time Shane and I had a frank discussion."**

309.    On July 30, 2021, Caesar Almase met face-to-face with Plaintiff and presented a guilty plea deal, which Plaintiff refused.

310.    **Caesar Almase told Plaintiff: "If you insist on going to trial, I will ensure you remain incarcerated in CCDC at least 6 years before going to trial, and then I will ensure you lose at that trial."**

311.    Plaintiff still refused the guilty plea.

**The Coerced Plea**

312.     On August 2, 2021, at Calendar Call, against Plaintiff's wishes, Caesar Almase told the court Plaintiff "may accept a Plea Deal" and requested a continuance to August 4, 2021.

313.     This demonstrated to Plaintiff that Almase could and would prolong Plaintiff's incarceration as threatened.

314.     Later that day, Almase hand-delivered a letter to CCDC for Plaintiff, acknowledging Plaintiff did not want to accept the plea agreement, telling Plaintiff the home surveillance video did not show self-defense (FALSE), and threatening to have the trial date "reset" if Plaintiff did not accept the guilty plea.

315.     That same day, Prosecutor Yu Meng filed an Amended Information reducing charges to a single count of **Attempt Battery with Substantial Bodily Harm**—without Plaintiff having accepted any plea.

316.     On August 4, 2021, under extreme duress and coercion, **Plaintiff accepted a forced guilty plea** (Alford plea) with the stipulation that Plaintiff's confiscated home surveillance DVR and laptop computer would be returned.  To date LVMPD still will not return Plaintiff's confiscated home surveillance DVR and laptop computer

317.     Prosecutor Yu Meng, who had vehemently argued Plaintiff should be held without bail at every hearing, suddenly agreed to Plaintiff receiving an OR release.

318.     This demonstrated that Yu Meng knew all along the case was baseless.

319.     Plaintiff was released from CCDC on August 4, 2021, with sentencing scheduled for December 1, 2021.

320.     Plaintiff had been wrongfully incarcerated for **115 days total** (April 12 - May 17, and May 24 - August 4, 2021).

### IX. POST-RELEASE: CONTINUED DENIAL OF JUSTICE

### A. Ongoing Theft and Police Refusal to Assist

321.     On August 5, 2021, Plaintiff discovered Pittman was still residing unlawfully in his home.

322.     Plaintiff believed he was under a TPO and not permitted within 100 yards of Pittman.

323.     Plaintiff called LVMPD requesting officers meet him down the street from his home.

324.     Plaintiff explained the situation and requested Pittman be trespassed from his home.

325.     **Not only did officers refuse to trespass Pittman, they also determined the TPO was not properly served while Plaintiff was in CCDC and served Plaintiff with the TPO on the spot.**

326.     This demonstrated continuing adamant refusal to provide any assistance to Plaintiff while showering Pittman with ill-gotten support and protection.

327.     On August 6, 2021, Plaintiff called LVMPD again, requesting assistance in removing Pittman from his home.

328.     **Officers again refused to trespass Pittman** but did take a theft report for Plaintiff's missing car.

329.     On August 11, 2021, Plaintiff retrieved his personal cell phone from Caesar Almase.

330.     Plaintiff discovered that **the entire time Almase had Plaintiff's phone, it was never even turned on.**

331.     Plaintiff confirmed the recorded phone calls were on the phone exactly where Plaintiff had told Almase they would be—but Almase never looked.

332.     On August 27, 2021, Pittman finally left Plaintiff's home.

333.     Plaintiff had to break into his own home.

334.     Plaintiff discovered **everything was gone**—all possessions, home appliances—and the home was extensively vandalized with holes in walls, spray paint, and a broken water main.

### B. Recovery of Stolen Vehicle - Sabotage and Continued Victimization

335.     On September 27, 2021, LVMPD recovered Plaintiff's stolen 2002 Acura. Reference No. 235412, Event No. 210800116310.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 31

336.    **The driver was Jeff Shurmur, one of Pittman's associates.**

337.    **Shurmur told police he had purchased the car from Rebecca Pittman.**

338.    This was a direct admission that Pittman had stolen and sold Plaintiff's vehicle.

339.    **Police did not arrest or charge Shurmur with receiving stolen property.**

340.    **Police did not ticket or cite Shurmur for driving with fictitious license plates** (see below).

341.    **Police did not arrest or charge Pittman with auto theft, despite Shurmur's statement directly implicating her.**

342.    The car had Nevada license plate **657H03** on it.

343.    **That license plate was registered to a completely different vehicle: a 2004 Acura TSX, VIN JH4CL96954C002960.**

344.    Pittman and/or her associates had **stolen the license plate from another vehicle** and put it on Plaintiff's car—a violation of NRS 482.545 (fictitious or altered plates).

345.    **Despite Shurmur driving with stolen/fictitious plates, police did not cite him for this crime.**

346.    **Police left the stolen/wrong license plate on Plaintiff's vehicle** when they had it towed to Ewing Bros. Towing impound.

347.    **If the car had the wrong license plate on it, how did police identify it as Plaintiff's stolen vehicle?**

348.    The only logical answer: **Police ran the VIN, discovered it was stolen, and knew the plate was wrong.**

349.    This proves police knew the plate was fictitious when they recovered the car, deliberately left it on to harm Plaintiff, and refused to charge the actual offender (Shurmur).

350.    **On September 29, 2021, Plaintiff had to pay $421 to retrieve his own stolen car from impound.**

351.    Plaintiff had to have the car towed to Colleen Keating's property.

352.    The vehicle had been extensively damaged and mechanically sabotaged while in Pittman's and Shurmur's possession.

**C. The Mechanical Sabotage**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 32

353.      Pittman and/or her associates had performed some kind of **immobilizer bypass** on the vehicle.

354.      This bypass caused the car's computer to throw error codes.

355.      Because of these error codes, **the vehicle would not pass Nevada emissions (smog) testing.**

356.      Without passing smog, Plaintiff could not re-register the vehicle with the DMV.

357.      Plaintiff's auto insurance had lapsed while he was wrongfully incarcerated (April-August 2021), causing the DMV to automatically cancel the car's registration.

358.      Plaintiff paid to reinstate insurance for 6 months, attempting to get the car back on the road legally.

359.      However, because of the sabotage, the car would not pass smog and could not be registered.

360.      Plaintiff had the car towed to three different mechanics seeking to diagnose and repair the immobilizer bypass.

361.      **None of the three mechanics could figure out what had been done to the vehicle or how to undo it.**

362.      This suggests the sabotage was deliberate and sophisticated—designed to render the vehicle permanently unusable.

363.      After 6 months of attempting repairs, Plaintiff's insurance expired.

364.      Because Plaintiff still could not register the vehicle (no smog pass), and could not afford to continue paying insurance on an undriveable car, Plaintiff did not renew the insurance.

### D. Set Up for Citations - The Stolen Plate Finally Used Against Plaintiff

365.      The last mechanic Plaintiff consulted needed the car moved to the other side of his parking lot.

366.      Plaintiff drove the vehicle around the block to reposition it.

367.      **Plaintiff was pulled over by police.**

368.      **Police cited Plaintiff for driving without insurance.**

369.    **Police also cited Plaintiff for fictitious/altered license plates** (NRS 482.545)—**the same stolen plate that LVMPD had left on the car and refused to cite Jeff Shurmur for.**

370.    **This demonstrates the deliberate nature of LVMPD's actions:**

- Police knew the plate was stolen when they recovered the car (September 27, 2021)
- Police deliberately left the stolen plate on the car
- Police refused to cite the person actually driving with stolen plates (Shurmur)
- Police later cited Plaintiff—the victim—for the stolen plate they themselves had left on his car

371.    When Plaintiff's stolen vehicle was recovered:

- Driver confessed he bought it from Pittman (auto theft confession) → **No charges**
- Driver was operating vehicle with stolen license plates → **No citation**
- Police deliberately left stolen plates on vehicle → **Set up for later citation**
- Police impounded the vehicle → **Forced victim to pay $421**
- Vehicle was mechanically sabotaged → **Rendered permanently unusable**
- Stolen plates left by police → **Victim later cited for them**

372.    This demonstrates LVMPD's systematic policy of protecting Pittman and her associates while continuously victimizing Plaintiff.

373.    Plaintiff's insurance premium increased from $325/year to $926/year (285% increase) due to the lapsed coverage during wrongful incarceration.

374.    Between the impound fees ($421), insurance costs, towing to three mechanics, mechanical diagnostics, attempted repairs, and eventual citations, Plaintiff suffered thousands of dollars in damages.

375.    The vehicle ultimately became a total loss due to the sabotage that could not be repaired.

### E. Financial Crimes - Detective Lopez Refuses to Investigate

376.     In November 2021, Plaintiff filed a police report for financial crimes with LVMPD South Central Area Command.

377.     However, Plaintiff had tried to file this report immediately upon his release in August 2021, but officers at South Central Area Command refused, stating "that's a civil matter."

378.     Plaintiff tried every day for two weeks and could get no assistance whatsoever.

379.     Plaintiff contacted the Attorney General and the FBI, who provided documentation compelling South Central Area Command to finally take a report.

380.     The case was assigned to Defendant Detective Junior Lopez, Financial Crimes Section.

381.     On December 7, 2021, Detective Lopez contacted Plaintiff requesting bank statements, credit card statements, and information about fraudulent accounts.

382.     Plaintiff provided all requested documentation showing:

- Unauthorized ATM withdrawals
- $16,000+ in fraudulent credit card applications and charges
- $6,000+ in unauthorized Amazon purchases delivered to Plaintiff's address
- Fraudulent charges at Harbor Freight (with extended warranty in Pittman's name) Sonic, tire shops
- Location data showing Pittman's movements to stores where Plaintiff's cards were used
- Text messages from Pittman admitting to financial crimes
- Handwritten check deposited by Pittman that bounced
- OfferUp listings showing Plaintiff's stolen property in Pittman's storage unit

383.     Detective Lopez's refusal to investigate extended even to cases where suspects confessed.

384.     When Plaintiff's stolen vehicle was recovered on September 27, 2021, the driver (Jeff Shurmur) told police he had purchased the car from Rebecca Pittman—a direct admission of Pittman's auto theft.

385.     Detective Lopez and LVMPD refused to charge Pittman with auto theft despite this confession.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 35

386.     On May 9, 2022, Detective Lopez left a voicemail stating there was "no video available to show who the suspect is" and "not enough evidence to make an arrest."

387.     On May 12, 2022, Plaintiff emailed Detective Lopez expressing disbelief that with all the documented evidence, charges could not be filed.

388.     On May 16, 2022, Detective Lopez responded, blaming Plaintiff for the delay in reporting.

389.     Detective Lopez stated video retention periods had expired (90 days for banks, 83 days for Harbor Freight, 7 days for Sonic).

390.     Detective Lopez stated that because transactions began shortly after Plaintiff's arrest (April 12, 2021) and Plaintiff didn't report until November 2021 (even though Plaintiff tried immediately but was refused), it was "too late."

391.     **Detective Lopez refused to charge Pittman with any crimes, despite:**

- Bank records with Pittman's transactions
- Extended warranty in Pittman's name
- Location data
- Text message admissions
- Confession from Shurmur about the car
- OfferUp listings with Plaintiff's property visible
- Over $22,000 in documented fraudulent charges

392.     This pattern of selective enforcement extended to vehicle crimes and demonstrated that LVMPD's protection of Pittman was not limited to one detective but was an institutional policy involving multiple units and officers.

393.     Plaintiff could not use identity theft recovery programs to clear his credit because police would not file an identity theft report.

394.     Plaintiff's homeowner's insurance claim was denied because police would not file a theft report.

395.     Plaintiff could not recover his stolen property sold on eBay (over $16,000 in custom audio equipment) because police would not file a theft report to provide eBay.

**F. Sentencing and Attempts to Withdraw Plea**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 36

396.    On October 20, 2021, Plaintiff's Pre-Sentence Investigative Report was filed with the court.

397.    **The PSI showed only a single non-violent misdemeanor from 20+ years ago— no felonies, no violent crimes** as Plaintiff had claimed all along.

398.    This proved Prosecutor Yu Meng had been lying to courts all along about Plaintiff's "extensive violent criminal history."

399.    Defense attorney Caesar Almase did nothing with this revelation.

400.    Instead, on October 25, 2021, Almase filed a Motion to Withdraw as Counsel.

401.    On November 8, 2021, Almase was allowed to withdraw. Attorney Michael Troiano was appointed.

402.    Through phone calls and emails, Plaintiff explained to Troiano the home invasion, false arrest, wrongful prosecution, and Almase's complete refusal to provide effective assistance.

403.    **Troiano also refused to address any of these issues.**

404.    On November 17, 2021, at a Confirmation of Counsel hearing, Troiano told Judge Erika Ballou that Plaintiff wanted to hire private counsel.

405.    The matter was continued two weeks.

406.    Outside the courtroom, **Troiano told Plaintiff there was no way he would take an appointed case to trial, and if Plaintiff wanted to withdraw the guilty plea, Plaintiff must have a private attorney at the next court date, or Troiano would tell the court there was not a good-faith basis to withdraw the plea.**

407.    On December 1, 2021, at another Confirmation of Counsel hearing, Plaintiff did not have private counsel.

408.    **Attorney Troiano and Judge Ballou conspired to keep Plaintiff's claims of self-defense off the record** by having Plaintiff waive attorney-client privilege.

409.    They then conspired to prevent Plaintiff from requesting a new appointed attorney by keeping Troiano as appointed counsel for sentencing only, despite Judge Ballou acknowledging a complete breakdown of the attorney-client relationship.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 37

410.     On December 15, 2021, at sentencing, Plaintiff was adjudicated guilty of Attempt Battery with Substantial Bodily Harm as a Gross Misdemeanor and sentenced to 6 months in CCDC (suspended) and 6 months probation.

411.     On January 19, 2022, Michael Troiano withdrew as attorney of record. No replacement was appointed.

412.     On June 16, 2022, prosecution confirmed Plaintiff had stayed out of trouble. The court ordered the case closed.

413.     On September 13, 2022, Judge Ballou filed Judgment of Conviction.

## X. WITHDRAWAL OF PLEA & DISMISSAL OF CHARGES

414.     On September 10, 2023, Plaintiff filed a pro se Motion to Withdraw Alford Plea.

415.     On October 9, 2023, prosecution claimed the motion was not served properly and requested 30 days to file opposition. Plaintiff requested 30 days to file a reply.

416.     On November 3, 2023, prosecution filed their Opposition to Defendant's Motion to Withdraw Alford Plea.

417.     On December 3, 2023, Plaintiff filed his Reply to State's Opposition.

418.     On December 18, 2023, Judge Mary Kay Holthus requested prosecutor Richard Scow view the home surveillance video Plaintiff kept insisting would exonerate him.

419.     The matter was continued three weeks.

420.     **On January 10, 2024, after finally viewing the video evidence, prosecution advised Judge Holthus that allowing Plaintiff to withdraw his Alford Plea was appropriate.**

421.     Judge Holthus allowed the withdrawal.

422.     **Prosecution announced: ALL CHARGES DROPPED.**

423.     This dismissal proves the prosecution knew or should have known from the beginning that Plaintiff was innocent and the charges were baseless.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 38

## XI. TOTAL DESTRUCTION OF PLAINTIFF'S LIFE

424.    As a result of Defendants' actions, Plaintiff lost:

- His home (current value ~$350,000)
- All personal property (~$100,000+ value stolen/sold)
- His vehicle (stolen, sabotaged, total loss)
- His tools and equipment needed for his profession
- His credit (destroyed by $16,000+ identity theft)
- His ability to obtain housing (criminal record)
- His ability to obtain employment (false criminal record on background checks)
- Family heirlooms including grandfather's Korean War rifle
- His dog (stolen by Pittman)
- His health (denied prescription medication, forced to remove contact lenses)
- His freedom (115+ days wrongful incarceration)
- His dignity and trust in the justice system

425.    Plaintiff is currently homeless, unemployed, and destitute as a direct result of Defendants' coordinated deprivation of his constitutional rights.

426.    Despite all charges being dismissed and Plaintiff's innocence established, LVMPD continues to refuse to assist Plaintiff in recovering his property or charging the criminals who destroyed his life.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 - Fourth Amendment - False Arrest Without Probable Cause

**(Against Individual Defendants Ciecko, Rivera, Hall, Peacock, Vesperas, Perez, Moss, Sutton, Barba, Camp, Morris, Tonge, and Does 1-10)**

427.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

428.     The Fourth Amendment protects against unreasonable searches and seizures, including arrest without probable cause.

429.     Defendants arrested Plaintiff on the following occasions without probable cause:

- February 1, 2021 (charges filed by Hall, Ciecko, Rivera - Case No. 21-CR-011347)
- April 12, 2021 (arrest by Peacock, Vesperas, Perez, Moss, Sutton - Case No. 21-CR-017669)
- May 24, 2021 (re-arrest by Barba, Camp, Morris, Tonge based on misrepresented TPO)

430.     No reasonable officer could have believed probable cause existed to arrest Plaintiff based on the facts known at the time.

431.     For the April 12, 2021 arrest:

- Plaintiff called 911 first, reporting a home invasion
- Plaintiff fired warning shots in self-defense during a documented home invasion captured on video
- No one was injured
- Defendants knew or should have known Plaintiff was the victim, not the perpetrator

432.     For the May 24, 2021 arrest:

- The TPO did not prohibit Plaintiff from his home
- All four officers read the TPO and knew it did not restrict Plaintiff from his home
- Officers deliberately lied about the TPO's contents to manufacture probable cause
- Plaintiff could not violate an order that was never properly served

433.     Defendants ignored exculpatory evidence including Plaintiff's 911 call, video evidence, physical evidence, and the actual contents of the TPO.

434.     Defendants' arrests of Plaintiff violated the Fourth Amendment.

435.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Fourth Amendment - Illegal Search and Seizure**

**(Against Individual Defendants Hanson, Vesperas, Campbell, and Does 1-10)**

436.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

437.    The Fourth Amendment protects against unreasonable searches and seizures.

438.    On April 12, 2021, Defendants entered and searched Plaintiff's home before obtaining a valid search warrant.

439.    Photo metadata proves officers entered and began photographing Plaintiff's home at 3:40 PM.

440.    The search warrant was not granted until 4:13 PM.

441.    Officers manually adjusted the camera clock ahead by 1 hour 8 minutes to conceal the illegal search.

442.    The search warrant affidavit was incomplete and omitted material facts, including that Plaintiff called 911 first and was defending his home.

443.    Defendant Hanson falsely stated he would seize telephonic evidence but deliberately failed to collect text messages showing the home invaders' coordination and threats.

444.    The search was conducted in violation of the Fourth Amendment.

445.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**THIRD CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Fifth Amendment - Self-Incrimination / Miranda Violations**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 41

**(Against Individual Defendants Peacock, Vesperas, Perez, Moss, Sutton, Campbell, and Does 1-10)**

446.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

447.    The Fifth Amendment protects against compelled self-incrimination and requires Miranda warnings before custodial interrogation.

448.    On April 12, 2021, Defendants arrested Plaintiff without reading him his Miranda rights.

449.    Defendants interrogated Plaintiff at the scene before arrest and at CCDC after arrest without Miranda warnings.

450.    Detective Campbell's "interview" with Plaintiff lasted one minute—not a meaningful attempt to obtain Plaintiff's statement but rather a procedural formality designed to create the appearance of investigation.

451.    Defendants violated Plaintiff's Fifth Amendment rights.

452.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Fourteenth Amendment - Due Process (Fabrication of Evidence)**

**(Against Individual Defendants Ciecko, Rivera, Hall, Vesperas, Peacock, Perez, Moss, Sutton, Campbell, Hanson, Barba, and Does 1-10)**

453.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

454.    The Fourteenth Amendment guarantees due process of law, including the right not to be deprived of liberty based on fabricated evidence.

455.    Defendants fabricated and falsified evidence against Plaintiff, including:

- False statements in police reports claiming Plaintiff "admitted" Pittman was a resident
- Omission of Plaintiff's 911 call from all reports

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 42

- Omission of home invasion from all reports
- False information provided to dispatch about Plaintiff's criminal history
- Falsified search warrant timeline (camera clock manipulation)
- Filing case documents under home invader's name (Gietler) instead of Plaintiff's name
- Misattributing home invader's criminal history to Plaintiff
- False statements by Barba about TPO contents on May 24, 2021

456.    Defendants knew these statements were false or made them with reckless disregard for the truth.

457.    Defendants' fabrication of evidence violated Plaintiff's right to due process.

458.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

---

**FIFTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Fourteenth Amendment - Due Process (Failure to Disclose Exculpatory Evidence)**

**(Against Individual Defendants Hall, Vesperas, Campbell, Hanson, and Does 1-10)**

459.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

460.    Under *Brady v. Maryland*, the government must disclose material exculpatory evidence to the defense.

461.    Defendants had access to exculpatory evidence including:

- Plaintiff's 911 call reporting home invasion
- Home surveillance video showing self-defense
- Text messages showing home invaders' coordination and threats
- Plaintiff's actual criminal history (one non-violent misdemeanor)
- The actual contents of the May 24, 2021 TPO

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 43

462.    Defendants concealed, suppressed, and failed to disclose this evidence to prosecutors and defense counsel.

463.    This evidence was material and favorable to Plaintiff.

464.    Defendants' suppression of exculpatory evidence violated Plaintiff's right to due process.

465.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**SIXTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Fourteenth Amendment - Malicious Prosecution**

**(Against Individual Defendants Ciecko, Rivera, Hall, Vesperas, Peacock, Perez, Moss, Sutton, Campbell, Hanson, and Does 1-10)**

466.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

467.    Defendants initiated and continued criminal proceedings against Plaintiff without probable cause:

- Case No. 21-CR-011347 (dismissed May 4, 2021)
- Case No. 21-CR-017669 / C-21-356187 (dismissed January 10, 2024)

468.    Defendants acted with malice or reckless disregard for Plaintiff's rights.

469.    The proceedings terminated in Plaintiff's favor when all charges were dismissed.

470.    Plaintiff suffered damages including 115+ days of false imprisonment, loss of liberty, loss of property, and other harms.

471.    Defendants' malicious prosecution violated Plaintiff's constitutional rights.

472.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**SEVENTH CLAIM FOR RELIEF**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 44

**42 U.S.C. § 1983 - Conspiracy to Violate Civil Rights (April 12, 2021 Home Invasion Arrest)**

**(Against Individual Defendants Ciecko, Rivera, Hall, Peacock, Vesperas, Perez, Moss, Sutton, Campbell, Hanson, and Does 1-10)**

473.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

474.     Defendants reached an understanding or agreement to violate Plaintiff's constitutional rights in connection with the April 12, 2021 incident.

475.     Evidence of conspiracy includes:

- Coordinated false information provided to dispatch about Plaintiff's criminal history
- Systematic omission of exculpatory facts (Plaintiff's 911 call, home invasion, self-defense) from all reports
- Filing evidence under wrong suspect's name (Gietler instead of Plaintiff)
- Repeated false statements about Plaintiff's criminal history by multiple officers
- Falsified search warrant timeline
- Coordination to arrest the victim and protect the criminals

476.     Defendants acted in concert to deprive Plaintiff of his constitutional rights.

477.     As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**EIGHTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Conspiracy to Violate Civil Rights (May 24, 2021 TPO Misrepresentation)**

**(Against Individual Defendants Barba, Camp, Morris, Tonge, and Does 1-10)**

478.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

479.      Defendants Barba, Camp, Morris, and Tonge reached an explicit agreement and understanding to violate Plaintiff's constitutional rights on May 24, 2021.

480.      The conspiracy is proven by:

- All four officers arriving together exactly 32 minutes after Family Court hearing
- All four reading the same TPO before arrival
- Barba making specific false statements about TPO contents
- Camp, Morris, and Tonge's knowing silence despite reading the same TPO
- Coordinated division of labor: Barba arrests, Tonge manufactures weapon charge, Camp and Morris install Pittman
- All four refusing to show Plaintiff the TPO
- All four refusing to give Plaintiff a copy of the TPO
- Barba refusing to leave copy at CCDC

481.      The conspiracy's purpose was to:

- Falsely arrest Plaintiff
- Remove Plaintiff from his home
- Reinstall Pittman in Plaintiff's home
- Give Pittman more time to steal and vandalize
- Keep Plaintiff incarcerated until he accepted coerced guilty plea

482.      **This conspiracy directly caused Plaintiff to accept the coerced guilty plea on August 4, 2021** because Plaintiff could not endure indefinite wrongful incarceration based on officers willing to fabricate evidence.

483.      As a direct and proximate result, Plaintiff suffered damages as alleged herein.

---

**NINTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Municipal Liability (Monell) - Unconstitutional Policies, Customs, and Practices**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 46

**(Against LVMPD and Clark County)**

484.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

485.     Defendant Clark County is liable under *Monell v. Department of Social Services* for constitutional violations caused by its policies, customs, or practices.

486.     Clark County, through LVMPD, maintained unconstitutional policies, customs, and practices including:

### A. Policy of Refusing to Remove Unwanted Guests:

487.     LVMPD officers consistently told homeowners they must "evict" guests who refuse to leave, even when no tenancy exists under Nevada law.

488.     This policy directly led to Plaintiff's inability to remove Pittman and the subsequent crimes against Plaintiff.

489.     This policy violates homeowners' constitutional rights to exclude trespassers from their property.

### B. Inadequate Training:

490.     LVMPD failed to train officers on:

- Distinguishing tenants from guests under NRS 118A.170 and NRS 207.200
- Proper domestic violence investigations and verification of victim statements
- Obligation to investigate exculpatory evidence
- *Brady* obligations to disclose exculpatory evidence
- Proper service and interpretation of protective orders

### C. Failure to Supervise:

491.     Supervisors failed to review reports for accuracy.

492.     No oversight of fabricated evidence.

493.     No discipline for false statements in reports.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 47

494.    Supervisor Peacock abandoned officers at the scene on April 12, 2021, allowing misconduct.

### D. Custom of Confirmation Bias:

495.    LVMPD has a pattern and practice of accepting the first complainant's story without investigation.

496.    Systematic failure to consider alternative explanations or investigate the accused's claims.

497.    Custom of treating initial complainant as "victim" regardless of evidence to the contrary.

### E. Custom of Selective Enforcement Protecting Certain "Victims":

498.    Once an individual is labeled a "victim" in the initial report, LVMPD systematically protects that person from all criminal liability regardless of subsequent crimes they commit.

499.    This custom is demonstrated by LVMPD's treatment of Pittman:

- Refused to investigate theft despite $100,000+ in stolen property
- Refused to charge identity theft despite $16,000+ in fraudulent accounts
- Refused to charge auto theft despite confession from person driving stolen car
- Refused to cite person driving with stolen license plates
- Deliberately left stolen plates on victim's car, then cited victim for them
- Refused to investigate financial crimes despite overwhelming documentary evidence
- Allowed "victim" to occupy actual victim's home for months
- Gave "victim" keys to actual victim's home
- Removed lawful tenants at "victim's" request

500.    This custom incentivizes false reporting and rewards criminals who make first contact with police.

501.    This custom creates a two-tier justice system where initial complainants are immune from prosecution.

**F. Deliberate Indifference:**

502.     Clark County was on notice of similar incidents but failed to correct policies.

503.     Policymakers were aware officers routinely mishandled domestic violence calls and guest/tenant disputes.

504.     Failed to implement corrective measures despite knowledge of constitutional violations.

505.     The dismissal of all charges against Plaintiff in January 2024 put Clark County on notice that its policies resulted in wrongful prosecution, yet no policy changes have been implemented.

**G. Moving Force:**

506.     These policies, customs, and practices were the moving force behind the violations of Plaintiff's rights.

507.     Plaintiff's injuries were a foreseeable result of these policies.

508.     Clark County acted with deliberate indifference to the constitutional rights of citizens.

509.     As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**TENTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Failure to Intervene**

**(Against Individual Defendants Peacock, Perez, Moss, Camp, Morris, Tonge, and Does 1-10)**

510.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

511.     These Defendants had a duty to intervene to prevent other officers from violating Plaintiff's constitutional rights.

512.     These Defendants were present and observed other officers:

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 49

- Making false arrests
- Fabricating evidence in reports
- Conducting illegal searches
- Denying due process
- Making false statements about TPO contents (Camp, Morris, Tonge on May 24, 2021)

513.    These Defendants had a realistic opportunity to intervene but failed to do so.

514.    Their failure to intervene violated Plaintiff's constitutional rights.

515.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**ELEVENTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 - Deprivation of Property Without Due Process**

**(Against All Defendants)**

516.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

517.    Defendants deprived Plaintiff of property without due process by:

- Giving Plaintiff's house keys to Pittman (a home invader and criminal trespasser)
- Allowing Pittman to occupy Plaintiff's home
- Enabling and facilitating theft of all Plaintiff's possessions
- Detective Campbell telling Pittman she could "sell everything"
- Refusing to investigate theft or recover property
- Forcibly removing lawful tenants from Plaintiff's home
- Seizing Plaintiff's vehicle and forcing him to pay $421 to retrieve it
- Deliberately leaving stolen license plates on Plaintiff's vehicle
- Refusing to charge confessed car thief
- Refusing to investigate financial crimes despite overwhelming evidence

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 50

518.      Plaintiff had a property interest in his home and possessions protected by the
Fourteenth Amendment.

519.      Defendants deprived Plaintiff of property without affording due process.

520.      As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**TWELFTH CLAIM FOR RELIEF**

**Nevada State Law - Malicious Prosecution**

**(Against All Individual Defendants)**

521.      Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

522.      Defendants initiated and continued criminal proceedings against Plaintiff.

523.      The proceedings lacked probable cause.

524.      Defendants acted with malice.

525.      The proceedings terminated in Plaintiff's favor (all charges dismissed January 10,
2024).

526.      Plaintiff suffered special injury, including imprisonment, loss of property, and
reputational harm.

527.      As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**THIRTEENTH CLAIM FOR RELIEF**

**Nevada State Law - Abuse of Process**

**(Against All Individual Defendants)**

528.      Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

529.      Defendants used legal process (arrest warrants, search warrants, criminal
prosecution, TPO) for an ulterior purpose.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 51

530.    Defendants' purpose was not to seek justice but to:

- Enable Pittman to occupy and loot Plaintiff's home
- Silence Plaintiff's complaints about trespassing
- Cover up their initial errors in refusing to remove Pittman
- Retaliate against Plaintiff for refusing to accept guilt
- Protect Pittman from criminal liability despite overwhelming evidence

531.    Defendants performed acts not proper in the regular conduct of the proceedings, including:

- Fabricating evidence
- Omitting exculpatory evidence
- Misrepresenting TPO contents
- Filing documents under wrong suspect's name

532.    Plaintiff suffered harm as a result.

533.    As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**FOURTEENTH CLAIM FOR RELIEF**

**Nevada State Law - Intentional Infliction of Emotional Distress**

**(Against All Individual Defendants)**

534.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

535.    Defendants engaged in extreme and outrageous conduct including:

- Falsely arresting Plaintiff multiple times
- Fabricating evidence
- Imprisoning Plaintiff for 115+ days on false charges
- Enabling theft of all Plaintiff's possessions (~$100,000+)

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 52

- Giving criminals keys to Plaintiff's home
- Telling criminal she could "sell everything"
- Refusing to provide assistance while protecting the criminals
- Forcing Plaintiff to pay $421 to retrieve his own stolen car
- Deliberately leaving stolen license plates on Plaintiff's car
- Later citing Plaintiff for the stolen plates they left on his car
- Refusing to investigate crimes against Plaintiff despite confessions and overwhelming evidence
- Denying Plaintiff prescription medication and eyeglasses during incarceration

536.     Defendants intended to cause emotional distress or acted with reckless disregard for the certainty that emotional distress would result.

537.     Plaintiff suffered severe emotional distress including anxiety, depression, trauma, and ongoing psychological harm.

538.     Defendants' conduct was the proximate cause of Plaintiff's distress.

539.     As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**FIFTEENTH CLAIM FOR RELIEF**

**Nevada State Law - Negligence**

**(Against LVMPD and Clark County)**

540.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

541.     Defendants owed Plaintiff a duty of care to conduct competent, thorough, and unbiased investigations.

542.     Defendants breached this duty by:

- Failing to investigate exculpatory evidence
- Failing to verify victim statements
- Failing to review video evidence before filing charges

- Failing to properly train and supervise officers
- Failing to discipline officers for fabricating evidence

543.     Defendants' breach proximately caused Plaintiff's injuries.

544.     As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**SIXTEENTH CLAIM FOR RELIEF**

**Nevada State Law - Civil Conspiracy**

**(Against All Individual Defendants)**

545.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

546.     Defendants agreed and combined to accomplish unlawful objectives: depriving Plaintiff of constitutional and statutory rights.

547.     Defendants committed overt acts in furtherance of the conspiracy, including:

- Providing false information to dispatch
- Fabricating police reports
- Filing documents under wrong suspect's name
- Coordinating false arrest on May 24, 2021
- Systematically refusing to investigate crimes against Plaintiff

548.     Plaintiff suffered injury as a result of the conspiracy.

549.     As a direct and proximate result, Plaintiff suffered damages as alleged herein.

**DAMAGES**

550.     As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer severe damages.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 54

### A. Economic Damages

551.     **Loss of home:** Plaintiff lost his home at 7240 Dingo Court representing approximately $180,000 in equity. Estimated value currently $380,000.

552.     **Theft of personal property:** All of Plaintiff's tools, computers, electronics, appliances, furniture, clothing, and personal belongings were stolen and sold, with a total value exceeding $100,000.

553.     **Vehicle theft, sabotage, and total loss:** Plaintiff's 2002 Acura was stolen, sold, mechanically sabotaged, and became a total loss. Damages include:

- Vehicle value: $8,000
- Impound fees: $421
- Insurance reinstatement: 6 months premium
- Towing fees to three mechanics
- Diagnostic fees at three mechanics
- Citations for stolen plates left by police
- 285% insurance premium increase ($325/year to $926/year)
- **Total vehicle-related damages: ~$10,000+**

554.     **Identity theft:** Pittman opened over $16,000 in fraudulent credit accounts in Plaintiff's name, which Plaintiff cannot clear because police refuse to file identity theft report.

555.     **Credit card fraud:** Over $6,000 in unauthorized charges on Plaintiff's existing credit cards.

556.     **Lost income:** Plaintiff lost employment opportunities (Lyft job voided due to false background check) and was unable to work during 115+ days of wrongful incarceration and months thereafter.

557.     **Legal fees:** Plaintiff was forced to pay $2,250 for defensive counsel (Damian Sheets) for the fabricated February 2021 domestic violence case.

558.     **Ongoing homelessness:** Plaintiff remains homeless and unable to secure housing due to destroyed credit, loss of all resources, and inability to pass background checks.

559.    **Future earning capacity:** Plaintiff's ability to earn income has been permanently impaired due to loss of tools and equipment needed for his profession, destroyed credit, and inability to obtain housing or employment.

**Total Economic Damages: $500,000+ (conservative estimate)**

**B. Non-Economic Damages**

560.    **False imprisonment:** 115+ days of wrongful incarceration:

- April 12 - May 17, 2021 (35 days)
- May 24 - August 4, 2021 (72 days)
- Plus time in overcrowded holding cells

561.    **Physical pain and suffering:**

- Forced to remove contact lenses without saline solution, rendering 20/200+ vision uncorrected for 115+ days
- Denied prescription medication (Wellbutrin) which manufacturer warns against suddenly stopping
- Overcrowded conditions during COVID-19 pandemic
- Lack of medical care

562.    **Mental and emotional distress:**

- Severe anxiety, depression, and PTSD
- Trauma from false accusations and wrongful imprisonment
- Trauma from loss of home and all possessions
- Trauma from betrayal by the justice system meant to protect him
- Ongoing psychological harm from homelessness and destitution
- Fear and distrust of law enforcement

563.    **Loss of family heirlooms:** Grandfather's Korean War service rifle (irreplaceable sentimental value).

564.    **Loss of pet:** Plaintiff's dog was stolen and never recovered.

565.    **Reputational harm:**

- False media coverage portraying Plaintiff as violent criminal
- Criminal record affecting employment, housing, and relationships
- Ongoing stigma despite all charges being dismissed

566.    **Loss of dignity and autonomy:**

- Subjected to house arrest with ankle monitor
- Invasive supervision by probation officer who threatened and harassed Plaintiff
- Threats of re-incarceration for actions Plaintiff did not commit
- Forced to accept coerced guilty plea under threat of 6+ years incarceration

567.    **Humiliation and degradation:**

- Being forced to pay $421 to retrieve his own stolen car
- Being cited for stolen plates that police left on his car
- Being treated as a criminal while actual criminals were protected
- Having to break into his own home repeatedly
- Watching criminals occupy his home while police refused to assist

**Non-Economic Damages: $200,000+ (conservative estimate)**

**C. Punitive Damages**

568.    Defendants' conduct was willful, wanton, malicious, oppressive, fraudulent, and in reckless disregard of Plaintiff's constitutional rights.

569.    Defendants:

- Fabricated evidence

- Concealed exculpatory evidence
- Made false statements to courts
- Conspired to deprive Plaintiff of liberty and property
- Coordinated lies about TPO contents to effect false arrest
- Systematically protected criminals while victimizing the actual victim
- Deliberately left stolen plates on victim's car to generate future citations
- Refused to investigate crimes despite confessions and overwhelming evidence

570.    The May 24, 2021 conspiracy is particularly egregious: four officers sat together, read a court order, and collectively agreed to lie about what it said to justify arresting an innocent man and stealing his home.

571.    Punitive damages are warranted to:

- Punish Defendants for their egregious conduct
- Deter similar conduct in the future
- Send a message that fabrication of evidence and conspiracy to violate civil rights will not be tolerated

572.    Plaintiff requests punitive damages in an amount sufficient to punish and deter, to be determined by the jury.

---

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Shane Edward Sipe respectfully requests this Court:

1. Assume jurisdiction over this matter;
2. Issue process and cause the same to be served upon all Defendants;
3. Set this matter for jury trial;
4. Enter judgment in favor of Plaintiff and against all Defendants, jointly and severally;
5. Award compensatory damages in an amount to be proven at trial, including but not limited to:

- o   Economic damages of at least **$300,000**
- o   Non-economic damages of at least **$200,000**
- o   **Total compensatory damages: $500,000+**

6.  Award punitive damages against individual Defendants in an amount sufficient to punish and deter similar conduct, to be determined by the jury;

7.  Award pre-judgment and post-judgment interest at the maximum rate allowed by law;

8.  Award Plaintiff's costs of suit, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

9.  Issue a declaratory judgment that Defendants' actions violated Plaintiff's constitutional and statutory rights;

10. Issue injunctive relief requiring LVMPD and Clark County to:

- o   Implement policy changes to prevent similar violations
- o   Provide training on tenant/guest distinctions under Nevada law
- o   Provide training on obligations to investigate exculpatory evidence
- o   Implement oversight and discipline for fabrication of evidence
- o   Cease the practice of protecting initial complainants regardless of subsequent criminal conduct

11. Order LVMPD to assist Plaintiff in recovering his stolen property and to file appropriate criminal charges against Rebecca Pittman, Katrina Amaya Lopez, and Jacob Gietler;

12. Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

**Dated:**   January 09, 2026

**Respectfully submitted,**

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 59

Shane Edward Sipe, Pro Se
3925 Six Gun Rd. North Las Vegas, Nevada 89032
702-372-4022
Shane_sipe@outlook.com

**VERIFICATION**

I, Shane Edward Sipe, declare under penalty of perjury under the laws of the United States and the State of Nevada that I am the Plaintiff in this action; that I have read the foregoing Complaint; that I know the contents thereof; and that the same is true of my own knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on January 09, 2026, at 3925 Six Gun Rd, North Las Vegas, Nevada.

/s/Shane Edward Sipe

Shane Edward Sipe

Dated this 9th day of January, 2026.

_____
Shane Edward Sipe, Pro Se

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS - 60